UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LIBERTY MUTUAL FIRE INSURANCE
COMPANY; LM GENERAL INSURANCE
COMPANY; LM INSURANCE
CORPORATION; and SAFECO
INSURANCE COMPANY OF ILLINOIS,

                        Plaintiffs,

v.

VAN DYKE SPINAL
REHABILITATION CENTER PLLC;
NEW GRACE SPINAL
REHABILITATION CENTER, PLLC;
PRODIGY SPINAL
REHABILITATION, PLLC; MICHAEL
MEERON, D.C.; ANTHONY PULICE,
D.C.; and SUMMER FAKHOURI, D.C.,

                        Defendants.

C.A. No. _____

**Demand for Jury Trial**

## COMPLAINT

    Plaintiffs Liberty Mutual Fire Insurance Company, LM General Insurance

Company, LM Insurance Corporation, and SAFECO Insurance Company of Illinois

(hereinafter, "Liberty Mutual" and/or "plaintiffs"), by their attorneys SMITH &

BRINK, hereby allege as follows.

1

## I.   <u>INTRODUCTION</u>

1.     This is a case about chiropractic clinics and the owners, agents, and representatives of the same who engaged in a scheme to defraud Liberty Mutual by submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail and interstate wires seeking to collect payment from Liberty Mutual for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*.

2.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Liberty Mutual to the defendants.

3.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.     By this Complaint, and as detailed in each count set out below, Liberty Mutual brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.  Liberty Mutual also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

5.     As a result of the defendants' fraudulent acts, Liberty Mutual has paid in excess of $1,340,984 to them related to the patients at issue in this Complaint.

## II.    THE PARTIES

### A.    PLAINTIFFS

6.     Liberty Mutual Fire Insurance Company is a company duly organized and existing under the laws of the State of Wisconsin.

7.     LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois are companies duly organized and existing under the laws of the State of Illinois.

8.     Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and SAFECO Insurance Company of Illinois each have their respective principal places of business in Boston, Massachusetts.

9.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.    DEFENDANTS

#### 1.    Van Dyke Spinal Rehabilitation Center PLLC

10.     Van Dyke Spinal Rehabilitation Center PLLC ("Van Dyke") is organized under the laws of the State of Michigan.

11.     At all relevant times, Van Dyke was owned, operated, and conducted by defendants Michael Meeron, D.C. ("Meeron") and Anthony Pulice, D.C. ("Pulice"), who are citizens of the State of Michigan.

12.     Van Dyke billed Liberty Mutual for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Liberty Mutual insureds, including the patients set out in Exhibit 1.

## 2.     New Grace Spinal Rehabilitation Center, PLLC

13.     New Grace Spinal Rehabilitation Center, PLLC ("New Grace") is organized under the laws of the State of Michigan.

14.     At all relevant times, New Grace was owned, operated, and conducted by Meeron, who is a citizen of the State of Michigan.

15.     New Grace billed Liberty Mutual for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Liberty Mutual insureds, including the patients set out in Exhibit 2.

## 3.     Prodigy Spinal Rehabilitation, PLLC

16.     Prodigy Spinal Rehabilitation, PLLC ("Prodigy") is organized under the laws of the State of Michigan.

17.     At all relevant times, Prodigy was owned, operated, and conducted by defendants Meeron and Summer Fakhouri, D.C. ("Fakhouri"), who are citizens of the State of Michigan.

18.     Prodigy billed Liberty Mutual for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Liberty Mutual insureds, including the patients set out in Exhibit 3.

### 4.     **Michael Meeron, D.C.**

19.     Meeron is a resident and citizen of the State of Michigan.

20.     At all relevant times, Meeron owned, operated, and conducted Van Dyke, New Grace, and Prodigy.

### 5.     **Anthony Pulice, D.C.**

21.     Pulice is a resident and citizen of the State of Michigan.

22.     At all relevant times, Pulice operated and conducted Van Dyke.

### 6.     **Summer Fakhouri, D.C.**

23.     Fakhouri is a resident and citizen of the State of Michigan.

24.     At all relevant times, Fakhouri owned, operated, and conducted Prodigy.

5

## III.   JURISDICTION AND VENUE

25.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

26.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

27.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

28.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   ILLEGAL SOLICITATION AND IMPROPER REFERRALS

29.     The defendants' scheme was heavily reliant on illegal solicitation of patients who claimed to be involved in motor vehicle accidents and improper inducement of such patients to present to the defendant clinics for services they did not actually need.

30.     Much of the illegal solicitation of patients was performed by or on behalf of the defendants' personal injury attorney associates who referred such solicited patients to the defendants as part of a *quid pro quo* arrangement to generate

bills for No-Fault payment and thereby increase the value of claims against Liberty Mutual.

31.     The most prominent personal injury attorney with whom the defendants worked to obtain patients was Michael Morse ("Morse") and his firm, which oversaw a network of runners and solicitors that used illegal methods to recruit patients.

32.     In exchange for referrals from personal injury attorneys like Morse, the defendants ordered, referred, and billed for extensive medically unnecessary treatment that was designed only to maximize the amount of charges submitted to Liberty Mutual and thereby increase the value of claims made both by the providers and by the personal injury attorneys.

33.     A chiropractor who was formerly associated with defendant Van Dyke testified that Meeron offered "rebates" to law firms that referred clients to his chiropractic clinics (defendants Van Dyke, New Grace, and Prodigy).

34.     "Rebates" to certain attorneys, including Morse, who was the biggest source of referrals to defendant Van Dyke at the time of the chiropractor's association, were made in cash.

35.     Cash payments in exchange for patient referrals are kickbacks, which are improper, illegal, and result in billing for treatment that is not medically necessary.

36.     Many of the patients at issue herein were referred by Morse and other personal injury attorneys to Meeron, Pulice, Fakhouri, Van Dyke, New Grace, and Prodigy, which in turn referred the patients to orthopedic and pain management physicians for additional treatment and prescriptions to generate further claims for No-Fault payments and increase the perceived value of their cases.

37.     Morse (on behalf of the defendants) obtained patients through the illegal use of unapproved police reports that were procured by his associates and used to contact patients and pressure them to begin treatment when they otherwise would not have.

38.     The direct connection between solicitation by Morse and medical treatment is confirmed in email correspondence between Morse and an associate named Jayson Rosett ("Rosett"), in which Morse assured Rosett that if Rosett got him police reports, Morse would get Rosett "more active treating patients." *See* Exhibit 4.

39.     Rosett was indicted in 2018 in relation to his illegal use of police reports to solicit individuals who claimed to be involved in motor vehicle accidents. *See* United States v. Jayson Rosett, et al., 18-cr-20812-MFL (E.D. Mich. 2018).

40.     The superseding information filed against Rosett confirms that the police reports were obtained by improper means and that they were not authorized

for release when they were used to solicit patients in the immediate aftermath of alleged motor vehicle accidents.  Id. at Docket No. 42.

41.    Indeed, Rosett paid as much as $7,500 per month in order to obtain these illegal police reports so that patients could be solicited to seek treatment within days (or sometimes hours) of alleged accidents.  Id.

42.    In a separate criminal proceeding involving this police report scheme, it was further explained that the unlawfully obtained police reports "bore a watermark reading 'Unapproved Report' indicating the reports were not publicly available and were the property of the Detroit Police Department.  In exchange for fees, [Rosett's company] solicited the crash victims and referred them to personal injury lawyers, **chiropractors**, Magnetic Resonance Imaging facilities, and health care professionals."  United States v. Matthew Carl Schwartz, 20-cr-20263-MFL-APP, Docket No. 1 (E.D. Mich. 2020) (emphasis added).  All of the defendants named in this Complaint are either chiropractors or chiropractic clinics.

43.    This scheme "caused the solicitation of accident victims identified in the Police Reports and directed the solicited accident victims to ENTITY A and other specific personal injury lawyers, **chiropractors**, medical doctors, and MRI facilities for services."  Id. (emphasis added).

44.    Not coincidentally, both Van Dyke and New Grace were located in offices adjacent to physical therapy clinics that were owned by Rosett.

45.    The following are representative exemplars of patients who were illegally solicited and pressured to undergo evaluation and treatment with the defendants:

- Patient R.C. (Claim No. 037740480)[1] testified that he was directed to defendant Van Dyke during his first telephone conversation with Michael Morse's office. Van Dyke then sent R.C. to an associated orthopedic clinic, where R.C. was prescribed extensive unnecessary testing and services to generate charges to Liberty Mutual, in addition to billing more than $17,600 for an unnecessary and excessive course of chiropractic treatment pursuant to a predetermined protocol that lasted for nearly eight (8) months.

- Patient L.M. (Claim No. 036475123) testified that she was sent to New Grace by her attorney, and from New Grace was referred to a physician regularly used by the defendants to obtain prescriptions and generate claims. New Grace also billed Liberty Mutual more than $5,300 for an unnecessary and excessive course of chiropractic treatment pursuant to a predetermined protocol that lasted for more than four (4) months.

- Patient J.P. (Claim No. 036648728) testified that he was sent to New Grace by Michael Morse and was sent by New Grace to a physician regularly used by the defendants to obtain prescriptions and generate claims. New Grace also billed Liberty Mutual more than $8,600 for an unnecessary and excessive course of chiropractic treatment pursuant to a predetermined protocol.

- Patient W.H. (Claim No. 034506655) was sent by Michael Morse to New Grace and Meeron then referred him to a physician regularly used by the defendants to obtain prescriptions and generate claims. New Grace billed Liberty Mutual nearly $37,000 for an unnecessary and excessive course of chiropractic treatment pursuant to a predetermined protocol that lasted for more than eleven (11) months.

- Patient D.M. (Claim No. 0314909610) testified that she was directed to Meeron by Michael Morse. Meeron billed for a purported initial evaluation of D.M. through Prodigy, and for an unnecessary and excessive subsequent

---

[1] To protect the confidentiality of its insureds, Liberty Mutual refers to them herein by initials and Liberty Mutual claim number.

course of treatment pursuant to the defendants' predetermined protocol that lasted for five (5) months through New Grace.

- Patient E.W. (Claim No. 040232935) was directed to Meeron by her attorney just six (6) days after an alleged accident. E.W. testified that her primary complaints were head and extremity injuries, and she could not explain why she was directed for evaluation with a chiropractor. New Grace billed Liberty Mutual $26,955 for an unnecessary and excessive course of chiropractic treatment that lasted for nearly nine (9) months, and Meeron referred E.W. to several associated physicians and providers in order to generate additional charges to Liberty Mutual.

46.     Patients who require solicitation, inducement, or pressure to seek medical treatment do not actually require medical care.

47.     Liberty Mutual is not required to pay the defendants for purported medical services that were not reasonable and necessary for the care of the patients at issue herein and that derived from illegal solicitation and kickbacks, and it is entitled to a return of the monies it has been induced to pay in reliance on the defendants' false submissions derived therefrom.

## V.     BILLING FOR SERVICES NOT RENDERED

48.     The defendants regularly submitted bills to Liberty Mutual seeking payment for services that were never rendered or issued to patients at issue herein.

49.     The following patients are representative examples of the defendants' practice of mailing and faxing bills to Liberty Mutual seeking payment for services that were not rendered:

- Patient M.G. (Claim No. 037903165) reported to Liberty Mutual that she was referred to New Grace by her attorney within days of her alleged motor

vehicle accident. M.G. expressly denied undergoing any treatment on the first date she presented to New Grace, which was July 30, 2018, stating that she only had an assessment by Meeron. New Grace mailed a bill to Liberty Mutual claiming to have performed hot/cold pack therapy, therapeutic exercises, and chiropractic manipulation to M.G. on that date, which was not performed at all according to M.G.

- Patient R.C. (Claim No. 037740480) testified that his treatments at defendant Van Dyke consisted of ten (10) to fifteen (15) minutes on a roller bed, two (2) to three (3) minutes of neck exercises, and about a minute and a half of use of a "clicker" on his back. Van Dyke billed Liberty Mutual for purportedly performing a combination of chiropractic manipulations, hot/cold pack therapy, mechanical traction, and therapeutic exercises on each date of service relative to R.C. None of the treatments reported by R.C. qualify as chiropractic manipulation or hot/cold pack therapy, and the few minutes of neck exercises do not come close to meeting the minimum time requirement to bill for therapeutic exercises.

- Patient J.D. (Claim No. 033082100) reported that she never received any adjustments or manipulation at New Grace, as such treatments aggravated her symptoms. New Grace nevertheless submitted bills to Liberty Mutual representing that it performed chiropractic manipulation on 72 of 73 dates J.D. allegedly presented for treatment, from December 9, 2015 to January 18, 2017.

- Patient C.B. (Claim No. 042385201) testified that the only treatments he received at New Grace where chiropractic manipulation and massage. New Grace billed Liberty Mutual for the alleged performance of therapeutic exercises and traction, and application of hot/cold packs, on every date it purportedly rendered treatment to C.B., none of which actually occurred based on C.B.'s testimony.

- Patient T.M. (Claim No. 036381629) testified that she did not receive chiropractic manipulation at her first visit at Van Dyke on October 24, 2017, but Van Dyke submitted a bill falsely representing that it performed chiropractic manipulation and other treatments on that date.

50.     The defendants submitted fraudulent claims to Liberty Mutual relative to each of the above-referenced exemplar patients for services that were not actually provided, and Liberty Mutual relied on such submissions in adjusting the claims.

51.     Liberty Mutual is not required to pay the defendants for services that were not actually rendered and is entitled to repayment for payments it was induced to make by the defendants' fraudulent submissions.

## VI.   UNREASONABLE     AND     UNNECESSARY     FRAUDULENT TREATMENT

52.     The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Liberty Mutual.

53.     The defendants also sought to bolster the appearance of injury and, therefore, increase the amount for which insurers such as Liberty Mutual were billed.

54.     To maximize their financial gain, the defendants adhered to a predetermined protocol that allowed them to bill for unnecessary, indiscriminate, and excessive treatment, as discussed more fully below.

55.     The defendants' treatment violated established standards of care in the medical community, as the vast majority of treatment, referrals, and services were not indicated, and were redundant, excessive, and repeated without any objectively documented benefit to patients.

13

56.     The full extent and pattern of the defendants' misrepresentations regarding the fact, lawfulness, and necessity of the treatment they billed was not known to Liberty Mutual until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

57.     The unnecessary treatment rendered by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 3.

58.     All of the claims submitted by the defendants to Liberty Mutual through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable services are fraudulent.

59.     Liberty Mutual is not required to pay the defendants for services that were medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

60.     None of the above facts were known to Liberty Mutual until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Liberty Mutual by the defendants.

A.    VAN DYKE'S, NEW GRACE'S, AND PRODIGY'S PREDETERMINED TREATMENT PROTOCOL

61.    As discussed above, patients at issue herein were directed to Van Dyke, New Grace, and Prodigy through illegal solicitation and by layperson personal injury attorneys in order to generate claims for submission to Liberty Mutual and not because they actually required or sought out chiropractic treatment.

62.    The purported treatment billed by Van Dyke, New Grace, and Prodigy was remarkably similar, as nearly every patient of the defendant clinics was prescribed the same course of treatment consisting of application of hot packs, therapeutic exercises, mechanical traction, and chiropractic manipulation. *See* Exhibits 1 through 3.

63.    Van Dyke, New Grace, and Prodigy billed for application of hot/cold packs for more than 99% of patients at issue herein. Id.

64.    Van Dyke, New Grace, and Prodigy also billed for chiropractic manipulation for more than 99% of patients at issue herein. Id.

65.    Van Dyke, New Grace, and Prodigy billed for traction for 88% of the patients at issue herein. Id.

66.    Van Dyke, New Grace, and Prodigy billed for therapeutic exercise for 86% of the patients at issue herein. Id.

67.    It is impossible that patients with different injuries, ages, genders, and comorbidities all actually required identical treatment plans.

68.     The predetermined protocol used by Van Dyke, New Grace, and Prodigy was not altered throughout the course of patients' alleged treatment.

69.     Indeed, Van Dyke, New Grace, and Prodigy almost never reevaluated patients to assess whether treatment was efficacious or whether patients had improved to the point that discharge should be considered.

70.     This action involves bills for 223 separate patients, most of whom allegedly underwent courses of chiropractic treatment that lasted for many months, but Van Dyke, New Grace, and Prodigy collectively only billed Liberty Mutual for 177 purported patient re-evaluations.

71.     As discussed below, the alleged reexaminations billed by Van Dyke, New Grace, and Prodigy were cursory and could not have actually amounted to a serious effort to determine whether further treatment was medically necessary.

72.     The predetermined protocol used by Van Dyke, New Grace, and Prodigy was so formulaic, records were often prepared that misrepresented that certain treatments were performed and later crossed out when there was a deviation.

73.     For example, New Grace submitted records to Liberty Mutual relative to patient J.M. (Claim No. 335969946002) for at least four (4) separate dates of service where it recorded that specific therapeutic exercises were performed, and then crossed out its own records when the patient did not end up performing the predetermined exercises, as exemplified below:



74.     Preparing medical records before treatment is actually performed confirms that there was never a determination of medical necessity and that the defendants' bills were for predetermined services not based on actual patient need.

## B.     FABRICATED AND INSUFFICIENT EVALUATIONS

75.     The defendants created the appearance of medical necessity for their predetermined and excessive courses of treatment by submitting medical records purporting to document initial evaluations of each patient.

76.     The initial evaluations billed by Van Dyke, New Grace, and Prodigy resulted in nearly identical findings between patients with a wide disparity of ages, alleged accidents, and comorbidities.

77.     Van Dyke, New Grace, and Prodigy diagnosed every patient who was purportedly evaluated with muscle spasms and subluxations.

78.     Indeed, Van Dyke, New Grace, and Prodigy's evaluation forms included pre-printed sections that ensured that every patient would receive these same diagnoses of spasms and subluxations, as depicted below:



79.     As illustrated above, Van Dyke, New Grace, and Prodigy made a determination before they ever even evaluated the patients at issue herein that treatment would be prescribed to treat alleged subluxations in every case.

80.     The initial evaluations billed by Van Dyke, New Grace, and Prodigy also omitted basic information that would be required to ascertain whether the extensive treatment billed actually improved patients' conditions, including patients' subjective pain scores.

81.     By failing to record basic information about patients' conditions at the outset of treatment, Van Dyke, New Grace, and Prodigy avoided creating documentation that would have revealed that treatment was billed for excessive lengths of time with no recorded objective or subjective patient improvement, which violates applicable chiropractic standards of care.

82.     The tests that were recorded as part of Van Dyke's, New Grace's, and Prodigy's purported initial evaluations included improbable results that were contradicted by the records of other physicians, including regularly representing that

patients' spinal ranges of motion were decreased by more than 50% in all planes of movement.

83.    For example, Van Dyke reported that patient B.S. (Claim No. 510339766039) had an extraordinary diminishment of range of motion in all movements of her cervical and lumbar spine at an evaluation billed on September 19, 2017.

84.    Less than three (3) weeks later, a physician to whom B.S. was referred by Meeron reported that she had full range of motion in both her cervical and lumbar spine.

85.    The evaluations allegedly performed by Van Dyke, New Grace, and Prodigy rarely, if ever, resulted in patient-specific treatment goals.

86.    The evaluations allegedly performed by Van Dyke, New Grace, and Prodigy rarely, if ever, resulted in specific plans with respect to the length and frequency of treatments.

87.    Instead of creating appropriate plans that could result in objective evaluations of whether treatment was beneficial, Van Dyke, New Grace, and Prodigy billed for the same treatments in perpetuity, regardless of whether a patient was benefitting therefrom.

88.     The purported findings made by New Grace, Van Dyke, and Prodigy to justify their excessive courses of treatment were often contradicted by patients' other medical providers and the patients themselves.

89.     For example, New Grace billed for the alleged performance of an extensive course of chiropractic treatment of patient R.L. (Claim No. 034385616) from September 23, 2016 through July 31, 2017.

90.     By November 9, 2016, R.L. reported to her primary care physician that she was feeling much better and requested permission to return to work at her job entailing physical labor.

91.     Rather than tapering R.L.'s care to account for her improved condition and functional capabilities, New Grace continued to bill for purported chiropractic treatment three (3) days per week and Meeron referred R.L. to an associated medical provider, where R.L. never received any treatment but incurred bills for eleven (11) level 4 and level 5 evaluations, medically unnecessary DME, and medically unnecessary over-the-counter medications.

## C.     EXCESSIVE TREATMENT

92.     Numerous patients at issue herein were subjected to courses of treatment that lasted for well over a year but never changed to account for the patients' changing medical conditions.

93.     At least fourteen (14) patients of Van Dyke, New Grace, and Prodigy at issue herein were billed for more than 100 separate dates of service, and nearly every single purported treatment of these patients included the exact same traction, therapeutic exercises, hot packs, and manipulations.

94.     For example, patient A.W. (Claim No. 34891969) allegedly began a course of treatment at New Grace on January 13, 2017.

95.     New Grace billed Liberty Mutual for purported treatment to A.W. over the next fifteen (15) months, which included at least 106 separate alleged dates of service, and represented that it performed traction, therapeutic exercise, hot packs, and manipulations at every appointment.

96.     Even as A.W.'s complaints persisted for over a year, New Grace never altered its predetermined protocol to attempt treatments that may have been more beneficial to the patient.

97.     Similarly, patient T.C. (Claim No. 035468209) allegedly began a course of treatment at Prodigy on April 26, 2017.

98.     Prodigy billed Liberty Mutual for purported treatment to T.C. over the next fourteen (14) months, which included at least 102 separate alleged dates of service, and represented that it performed traction, therapeutic exercise, hot packs, and manipulations on all but one date of service.

99.     Even as T.C.'s complaints persisted for over a year, Prodigy never altered its predetermined protocol to attempt treatments that may have been more beneficial to the patient or discontinued treatments for futility.

100.    Patient R.C. (Claim No. 037740480) testified that he received activator treatment to his mid-back at every appointment at Van Dyke despite not having any complaints relating to his mid-back.

101.    Meeron, Pulice, Fakhouri, Van Dyke, New Grace, and Prodigy also subjected patients to their predetermined protocol of treatment even when they had reason to believe that such treatment could be harmful.

102.    For example, on April 3, 2017, Meeron noted that patient J.M. (Claim No. 335969946002) had a possible disc pathology that required an MRI.

103.    J.M. did not undergo the MRI that was allegedly required to rule out significant spinal injury for three (3) weeks, but New Grace continued to bill for the exact same treatments, including spinal traction and manipulations, without seeing the imaging result.

104.    Similarly, Meeron noted during his purported initial evaluation of patient B.S. (Claim No. 510339766039) that she should have diagnostic imaging to rule out the existence of a structural spinal injury.

105.   B.S. did not undergo any such imaging for more than two (2) months after Meeron's comment, but Van Dyke billed for alleged chiropractic treatment pursuant to its predetermined protocol anyway.

106.   When B.S. finally underwent the MRI, it revealed an apparent "aberrant" structure in her lumbar spine.

107.   Despite this finding, Van Dyke did not alter its course of therapy.

### D.   REDUNDANT TREATMENT

108.   Treatment billed by Van Dyke, New Grace, and Prodigy also frequently overlapped with identical treatments alleged rendered as physical therapy billed by other providers, which was improper and medically unnecessary.

109.   For example, New Grace billed for an extensive course of alleged chiropractic treatment of patient N.T. (Claim No. 037220453) from March 30, 2018 through March 25, 2019, which included bills for application of hot packs and therapeutic exercise on nearly every date of service.

110.   On July 25, 2018, a physical therapy provider began submitting bills for purported physical therapy performed on N.T., and also claimed to apply hot packs and perform therapeutic exercises at nearly every visit.

111.   This overlapping and redundant treatment by New Grace and the physical therapy provider continued for nearly five (5) months, until the course of physical therapy was temporarily stopped on December 10, 2018.

112.   On several occasions, New Grace and the physical therapy provider billed for identical treatments performed on consecutive dates, including a two (2) week period in September 2018 wherein N.T. purportedly received hot packs and therapeutic exercises at New Grace on Mondays, Wednesdays, and Fridays, and at the physical therapy provider on Tuesdays and Thursdays.

113.   Similarly, New Grace and a physical therapy provider billed Liberty Mutual for a simultaneous course of chiropractic and physical therapy to patient J.P. (Claim No. 037083351) from March 2018 to May 2018, including bills for the same alleged treatments on the same dates of service.

114.   Van Dyke billed Liberty Mutual for a simultaneous course of chiropractic and physical therapy to patient T.W. (Claim No. 466055855033) for nearly a full year, from October 2014 to August 2015, which included the alleged performance of the same treatments on the same dates of service at two (2) different clinics.

115.   It was never medically necessary for patients to undergo courses of therapy that were nearly identical with multiple providers at the same time.

116.   Van Dyke, New Grace, and Prodigy intentionally failed to determine whether the treatments for which they billed Liberty Mutual were redundant and unnecessary, as Meeron has testified that he does not ask patients about other

medical treatment they may be receiving elsewhere, which is below the acceptable standard of care.

117.   The defendants' disregard for whether patients were concurrently undergoing the same or similar treatments is further evidence that their prescribed courses of care had nothing to do with medical necessity, and were therefore never compensable.

### E.   UNLAWFUL BILLS FOR CHIROPRACTIC TREATMENTS

118.   All of the bills at issue herein that were faxed and mailed to Liberty Mutual by the defendants claim entitlement to payments pursuant to Michigan's No-Fault Act.

119.   The No-Fault Act provides that benefits for chiropractic treatment are only payable if the service(s) allegedly provided were "included in the definition of practice of chiropractic under section 16401 of the public health code, 1978 PA 368, MCL 333.16401, as of January 1, 2009."  Mich. Comp. Laws § 500.3107b(b).

120.   Excluded from the practice of chiropractic in the pre-2009 definition are hot/cold packs, ultrasound, and traction, among other treatments.

121.   Despite this prohibition, Van Dyke, New Grace, and Prodigy regularly billed Liberty Mutual for purported application of hot packs, which was an integral part of the clinics' predetermined treatment protocol.  *See* Exhibits 1 through 3.

122.   Van Dyke, New Grace, and Prodigy also regularly billed Liberty Mutual for the alleged performance of traction to nearly every patient at issue herein. Id.

123.   None of these purported services billed by Van Dyke, New Grace, and Prodigy were ever lawful chiropractic treatment pursuant to the No-Fault Act, and all claims for payment relative to such alleged services were fraudulent.

**F.   QUANTITY OF TREATMENT BILLED**

124.   Van Dyke, New Grace, and Prodigy billed Liberty Mutual at rates that evidence that if treatment was performed at all, it was done in a non-patient-specific fashion.

125.   As discussed above, the defendants' practice of billing for redundant treatments by both a chiropractic clinic and at a physical therapy provider resulted in patients at issue herein being given duplicative treatment.

126.   New Grace has also billed Liberty Mutual for allegedly treating as many as thirteen (13) Liberty Mutual insureds in a single day, a number that does not include any purported treatment to patients insured by other insurance companies in Michigan.

127.   Several of the treatments billed by Van Dyke, New Grace, and Prodigy have minimum time requirements, and the defendants have submitted bills

representing that they performed hours of purported timed treatment on Liberty Mutual insureds on a single day.

128. This extraordinary number of patients and amount of billing on the same days does not include patients who were insured by other carriers or the time spent performing untimed treatments, including the purported hot packs, mechanical traction, and chiropractic manipulations that were billed relative to nearly every patient on nearly every date of service.

129. Individual patients were also observed at the defendant chiropractic clinics for lengths of time that were so short that it was impossible that treatment was performed as billed and, if treatment was performed, it was done so quickly it could not have been properly supervised or evaluated.

130. For example, patient R.C. (Claim No. 037740480) was observed entering Van Dyke at 3:27 p.m. on September 18, 2018 and leaving at 3:46 p.m., for a total time at the clinic of nineteen (19) minutes.

131. Van Dyke submitted bills to Liberty Mutual claiming to have administered hot packs, traction, chiropractic manipulation, and therapeutic exercises, the last of which is a timed therapy for which each unit billed represents fifteen (15) minutes of treatment.

132. Even if it were assumed that R.C. did not spend any time at all (1) signing in, (2) waiting for the physician, (3) transferring between modalities, (4)

resting between exercises, or (5) reporting his condition and the impact of the treatments, he still would have been left with just minutes to undergo each of the treatments that were billed.

133.   Van Dyke and New Grace also submitted bills claiming to have performed treatment, including therapeutic exercises, on patients on the same dates that patients purportedly underwent painful and invasive procedures performed by other providers.

134.   It is highly unlikely that patients were able to perform the treatment billed, which almost invariably included exercise, after undergoing invasive procedures, particularly when such procedures required IV sedation on the same date.

## VII.   FRAUDULENT BILLING PRACTICES

135.   In addition to submitting claims for treatment and services that were medically unnecessary or were not performed at all, the defendants further increased the amounts of claims submitted to Liberty Mutual by fraudulently misrepresenting the services allegedly performed through improper billing and coding practices.

## A.   IMPROPER USE OF CPT CODE MODIFIERS

136.   Van Dyke, New Grace, and Prodigy each regularly submitted bills to Liberty Mutual using Current Procedural Terminology ("CPT") Code[2] modifier 52, which indicates that a service was partially reduced at the physician's discretion.

137.   Van Dyke, New Grace, and Prodigy never provided an explanation of how or why such procedures were reduced, which is a requirement of use of CPT Code modifier 52, despite submitting thousands of claims appending this billing modifier.

138.   CPT Code modifier 52 is not appropriately used for time-based billing, such as the purported therapeutic exercises billed by Van Dyke, New Grace, and Prodigy relative to 85% of the patients at issue herein.

139.   CPT Code modifier 52 is also inappropriate for physical therapy modalities, including application of hot/cold packs and mechanical traction.

140.   Van Dyke, New Grace, and Prodigy nevertheless regularly appended CPT Code modifier 52 to their bills for therapeutic exercises, application of hot/cold packs, and mechanical traction.

141.   Moreover, when Van Dyke, New Grace, and Prodigy billed Liberty Mutual using CPT Code modifier 52, they never altered the amount charged for each

---

[2] CPT Codes are published annually by the American Medical Association to establish standards and facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

modality despite reporting that they performed reduced services that would not otherwise meet the requirements of payment for the services billed.

142.   Instead, Van Dyke, New Grace, and Prodigy improperly billed Liberty Mutual the exact same amount regardless of whether the service was performed in full or whether it was reduced at the physician's discretion.

143.   Beginning in or about November 2019, Van Dyke, New Grace, and Prodigy replaced their use of CPT Code modifier 52 with modifier 59, which is used to report that charges that are ordinarily not permitted to be submitted together are proper because there was a separate patient encounter or procedure on the same date of service.

144.   Appending modifier 59 to CPT Codes indiscriminately is a deceptive practice intended to bypass claim adjudication systems that would detect fraudulent unbundling.

145.   Indeed, in 2014, the Centers for Medicare and Medicaid Services ("CMS") released a publication warning providers that CPT Code modifier 59 was being overused and was associated with cases of fraud and abuse of the system.

146.   As with their use of CPT Code modifier 52, the defendants never provided an explanation as to why they were reporting that the services billed using CPT Code modifier 59 required modified reporting.

### B.   FRAUDULENT UPCODING

147.   Physician examinations of patients are billed using CPT Codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT Code for the complexity involved in the examination.

148.   To the extent that Van Dyke, New Grace, and Prodigy claimed to perform patient evaluations, they were nearly always represented to be highly complex despite performing examinations that were simple, brief, and cursory, if they were performed at all.

149.   There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

150.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920" and reexaminations are billed using a CPT Code that starts with the numbers "9921."

151.   The final number to complete each five-digit CPT Code for examinations is one (1) through five (5), depending on the complexity of the evaluation performed.

152.   Nearly every patient evaluation billed by Van Dyke, New Grace, and Prodigy was represented to be of level 4 complexity.  *See* Exhibits 1 through 3.

153. To properly bill a reexamination using a level 4 complexity code, the physician must have taken a detailed history, performed a detailed examination, and engaged in medical decision-making of moderate complexity.

154. The American Medical Association has guided that level 4 reexaminations typically involve 25 minutes of face-to-face time with the patient.

155. The examinations and consultations billed by Van Dyke, New Grace, and Prodigy did not rise to the level of complexity required to bill for level 4 evaluations.

156. Indeed, the services performed on dates that Van Dyke, New Grace, and Prodigy allegedly performed level 4 patient reexaminations are indistinguishable from normal treatment dates of service but for the additional charge submitted to Liberty Mutual.

157. In many cases, Van Dyke, New Grace, and Prodigy simply decided to bill for a purported level 4 reexamination when the office note produced from an appointment – which were normally just several lines long – were slightly longer than normal.

158. Even if any patient evaluations were performed at all (beyond the evaluation necessarily performed in order to perform treatment, which is not separately billable) on these dates of service, such evaluations did not come close to meeting the criteria for billing as a level 4 encounter.

159.   For example, the following constitutes the entire record of a purported level 4 encounter with patient J.M. (Claim No. 335969946002) on June 7, 2017:

> Areas adjusted- C7, T6, L5.  The thoracic and low back are showing more improvement than the cervical spine.  MRI reports have been discussed.  The patient does continue to generally leave this office with improvement.  It is not permanent, but it has been beneficial.  The knee, shoulder complaints are areas that we have not addressed.  Cervical ranges of motion are 45 degrees bilaterally, flexion and extension are 35. This is improvement in every area.  Thoracic lumbar ranges of motion, flexion is 40, no change in extension, spasm is reduced though.  Thoracic spasm is mild plus, cervical and lumbar area slightly less than moderate. Positive Soto-Hall.  The patient is showing improvement and is under the care of the surgical group, Mendelsohn and Kornblum.  Continue current treatment at this time.  Improvement is continuing.

160.   The above example is representative of all purported reexaminations billed by Van Dyke, New Grace, and Prodigy.

161.   Initial patient evaluations billed by Van Dyke, New Grace, and Prodigy also did not meet the criteria for the level 4 encounters they nearly always represented by the bills submitted to Liberty Mutual.

162.   Van Dyke, New Grace, and Prodigy's initial evaluations were performed pursuant to a fill-in-the-blank template record that, among other deficiencies, only obtained basic information from patients and not the detailed medical histories required to bill for a complex encounter.

163.   The defendants intentionally induced Liberty Mutual to make payments for services of a complexity that were not performed as billed by mailing and faxing false documentation using improper coding, and Liberty Mutual relied upon such mailings in adjusting claims and remitting payment.

## VIII.  THE DEFENDANTS' MATERIAL MISREPRESENTATIONS

164.   To induce Liberty Mutual to pay promptly their fraudulent charges, the defendants submitted to Liberty Mutual false documentation that materially

33

misrepresented that the services they billed were reasonable and necessary within the meaning of Michigan law, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

165. Every time the defendants submitted bills and medical records to Liberty Mutual, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

166. There are no less than eight (8) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Liberty Mutual:

    a. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri billed Liberty Mutual for treatment and services that were not actually provided. Patients at issue in this Complaint have denied receiving treatments and services for the lengths of time required, in the manner required, and reported not receiving treatment and services at all from these defendants.

    b. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri obtained patients through unlawful solicitation and improper referrals. The defendants engaged in *quid pro quo* relationships with associates and with personal injury attorneys to establish a supply of patients for their fraudulent scheme. The defendants' methods of obtaining patients and making referrals to each other did not include considerations of medical necessity.

    c. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri billed Liberty Mutual for the purported application of hot/cold packs to nearly every patient at issue herein despite the clear statutory direction that such services, if performed at all, are not compensable under the No-Fault Act when allegedly performed by chiropractors.

34

    d. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri used an unlawful predetermined treatment protocol, implemented by the ordering of excessive chiropractic and therapy modalities. This predetermined protocol is confirmed by the nearly identical purported findings and treatment plans ordered for patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

    e. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri attempted to create the appearance of medical need for their excessive treatment by recording purported patient examination findings that did not vary between patients with different ages, injuries, and comorbidities, and were contradicted by other treating physicians.

    f. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri did not alter the predetermined protocol of treatment, and did not discontinue or alter treatment plans in response to patients' reports that their conditions had improved or in response to information that patients conditions were worsening or could be exacerbated by continuing care.

    g. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri used fraudulent billing practices, including improper use of CPT Code modifiers, to induce Liberty Mutual to remit payment for services that were not billable in the manner reported.

    h. Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri fraudulently upcoded bills for alleged patient evaluations to seek payment for encounters that were far less complex than represented by the bills submitted to Liberty Mutual.

167. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

168. The foregoing facts – billing for services not rendered, unlawfully soliciting patients, using a predetermined treatment protocol to inflate charges, and

misrepresenting the necessity of services billed to conceal their scheme – were not, and could not have been, known to Liberty Mutual until it commenced its investigation of the defendants shortly before the filing of this action.

169.   Liberty Mutual had no contractual relationship with the defendants relative to the claims at issue herein and had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

170.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment, services, and testing billed by the defendants unnecessary and unlawful.

171.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific representative patients set out above and in the charts annexed at Exhibits 1 through 3.

172.   Thus, each claim for payment (and accompanying medical records) mailed and faxed to Liberty Mutual by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

173.   Moreover, each Health Insurance Claim Form ("HICF") bill submitted to Liberty Mutual by the defendants contained the following notation: "NOTICE:

Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

174.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Liberty Mutual via the U.S. Mail and interstate wires, the defendants attested to the fact, lawfulness, and medical necessity of the visits, treatment, and services for which they billed Liberty Mutual.

175.   As the defendants did not render lawful and reasonably necessary medical treatment and services, and misrepresented the treatment and services purportedly performed, each bill and accompanying documentation mailed or faxed by the defendants to Liberty Mutual in order to seek payment constitutes a material misrepresentation.

176.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Liberty Mutual did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

177.   The facially valid documents submitted to Liberty Mutual by the defendants were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

178.   In reliance on the defendants' misrepresentations, Liberty Mutual paid money to the defendants to its detriment.

179.   Liberty Mutual would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and services billed.

180.   As a result, Liberty Mutual has paid in excess of $1,340,984 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for insurance payments.

## IX.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

181.   As discussed *supra*, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

182.   The objective of the scheme to defraud Liberty Mutual, which occurred throughout the period noted in Exhibits 1 through 3 was to collect insurance payments under applicable provisions of Michigan law and regulations to which the defendants were not entitled because the medical services rendered, if at all, were not necessary, were not lawfully rendered, and were fraudulently billed.

183.   This objective necessarily required the submission of claims for payment to Liberty Mutual.

184.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.  The documents, records, and bills faxed by the defendants to Liberty Mutual were sent from Michigan and received by Liberty Mutual in California.

185.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

186.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and checks.

187.   Every payment at issue in this Complaint where Liberty Mutual was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Liberty Mutual using the U.S. Mail.

188.   The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

189.   A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 5.

190.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Liberty Mutual via fax or mail related to each exemplar patient discussed in this Complaint.

191.   It was within the ordinary course of business for Van Dyke, New Grace, and Prodigy to submit bills for payment to insurance carriers like Liberty Mutual through interstate wires and the U.S. Mail.

192.   Moreover, the business of billing for medical services by each of the defendant clinics at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

193.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

194.   The defendant entities, at the direction and with the knowledge of Meeron, Pulice, and Fakhouri, continue to submit claims for payment to Liberty Mutual and, in some instances, continue to commence litigation against Liberty Mutual seeking to collect on unpaid claims.

195.   Thus, the defendants' commission of mail and wire fraud continues.

196.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Liberty Mutual

by seeking payment for services that are not compensable, these defendants committed mail fraud, as defined in 18 U.S.C § 1341.

197.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

198.   Liberty Mutual reasonably relied on the submissions it received from Van Dyke, New Grace, and Prodigy including the representative submissions set out in Exhibit 5 annexed hereto and identified in the representative patient examples above.

199.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Liberty Mutual's damages.

## X.   DAMAGES

200.   The pattern of fraudulent conduct by the defendants injured Liberty Mutual in its business and property by reason of the aforesaid violations of law.

201.   Although it is not necessary for Liberty Mutual to calculate damages with specificity at this stage in the litigation, and Liberty Mutual's damages continue

to accrue, Liberty Mutual's injury includes, but is not limited to, compensatory damages in excess of $1,340,984.

202.   Exhibits 6 (Van Dyke), 7 (New Grace), and 8 (Prodigy) annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Liberty Mutual to the defendants by date, payor, patient claim number, check number, and amount.

203.   Every payment identified in Exhibits 6 through 8 was made by Liberty Mutual alone and from checks sent to the defendants through the U.S. Mail, and Liberty Mutual has not been reimbursed for any of the payments itemized in Exhibits 6 through 8.

204.   Liberty Mutual also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

205.   Liberty Mutual investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XI.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Van Dyke Enterprise)
### Against Michael Meeron, D.C. and Anthony Pulice, D.C.

206.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

207.   Van Dyke constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

208.   In connection with each of the claims identified in the within Complaint, Meeron and Pulice intentionally caused to be prepared, faxed, and mailed false medical documentation by Van Dyke, or knew that such false medical documentation would be prepared, faxed, and mailed in the ordinary course of Van Dyke's business, or should have reasonably foreseen that the mailing of such false medical documentation by Van Dyke would occur, in furtherance of the defendants' scheme to defraud.

209.   Meeron and Pulice knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those faxes and mailings identified in the chart annexed hereto at Exhibit 5.

210.   As documented above, Meeron and Pulice repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted

43

to Liberty Mutual through interstate wires and the U.S. Mail for medical services that were purportedly performed by Van Dyke, which he knew would be billed by Van Dyke, in order to collect payment from Liberty Mutual.

211. Meeron and Pulice owned and managed Van Dyke and were responsible for all actions taken by Van Dyke and its staff.

212. Meeron and Pulice submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Van Dyke to continue providing unlawful and medically unnecessary treatment, if provided at all.

213. As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payments to Van Dyke for the benefit of Meeron and Pulice that would not otherwise have been paid.

214. Meeron and Pulice's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

215. By virtue of Meeron and Pulice's violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Van Dyke Enterprise)
### Against Michael Meeron, D.C. and Anthony Pulice, D.C.

216.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

217.   Defendants Meeron and Pulice conspired with each other and with associates, including the personal injury attorneys and medical practices detailed above, to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Van Dyke.

218.   Meeron, Pulice, and their associates each agreed to further, facilitate, support, and operate the Van Dyke enterprise.

219.   As such, Meeron and Pulice conspired to violate 18 U.S.C. §1962(c).

220.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Van Dyke even though Van Dyke was not eligible to collect such payments by virtue of its unlawful conduct.

221.   Meeron and Pulice were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

222.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make

insurance payments as a result of Meeron and Pulice's unlawful conduct described herein.

223. By virtue of this violation of 18 U.S.C. § 1962(d), Meeron and Pulice are liable to Liberty Mutual and Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf of Meeron and Pulice, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Grace Enterprise)
### Against Michael Meeron, D.C.

224. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

225. New Grace constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

226. In connection with each of the claims identified in the within Complaint, Meeron intentionally caused to be prepared, faxed, and mailed false medical documentation by New Grace, or knew that such false medical documentation would be prepared, faxed, and mailed in the ordinary course of New Grace's business, or should have reasonably foreseen that the mailing of such false medical documentation by New Grace would occur, in furtherance of the defendants' scheme to defraud.

227.   Meeron knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those faxes and mailings identified in the chart annexed hereto at Exhibit 5.

228.   As documented above, Meeron repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by New Grace, which he knew would be billed by New Grace, in order to collect payment from Liberty Mutual under Liberty Mutual.

229.   Meeron owned and managed New Grace and was responsible for all actions taken by New Grace and its staff.

230.   Meeron submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted New Grace to continue providing unlawful and medically unnecessary treatment, if provided at all.

231. As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payments to New Grace for the benefit of Meeron that would not otherwise have been paid.

232.   Meeron's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

233.   By virtue of Meeron's violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from him three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(New Grace Enterprise)**
**Against Michael Meeron**

234.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

235.   Defendant Meeron conspired with associates, including the personal injury attorneys and medical practices detailed above, to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of New Grace.

236.   Meeron and his associates each agreed to further, facilitate, support, and operate the New Grace enterprise.

237.   As such, Meeron conspired to violate 18 U.S.C. §1962(c).

238.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of New Grace even though New Grace was not eligible to collect such payments by virtue of its unlawful conduct.

239.   Meeron was aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

240.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of Meeron's unlawful conduct described herein.

241.   By virtue of this violation of 18 U.S.C. § 1962(d), Meeron is liable to Liberty Mutual and Liberty Mutual is entitled to recover from him three times the damages sustained by reason of the claims submitted by or on behalf of Meeron, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Prodigy Enterprise)
### Against Michael Meeron, D.C. and Summer Fakhouri, D.C.

242.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

243.   Prodigy constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

244.   In connection with each of the claims identified in the within Complaint, Meeron and Fakhouri intentionally caused to be prepared, faxed, and

mailed false medical documentation by Prodigy, or knew that such false medical documentation would be prepared, faxed, and mailed in the ordinary course of Prodigy's business, or should have reasonably foreseen that the mailing of such false medical documentation by Prodigy would occur, in furtherance of the defendants' scheme to defraud.

245. Meeron and Fakhouri knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those faxes and mailings identified in the chart annexed hereto at Exhibit 5.

246. As documented above, Meeron and Fakhouri repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Prodigy, which they knew would be billed by Prodigy, in order to collect payment from Liberty Mutual.

247. Meeron and Fakhouri owned and managed Prodigy and were responsible for all actions taken by Prodigy and its staff.

248. Meeron and Fakhouri submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Prodigy to continue providing unlawful and medically unnecessary treatment, if provided at all.

249.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payments to Prodigy for the benefit of Meeron and Fakhouri that would not otherwise have been paid.

250.   Meeron and Fakhouri's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

251.   By virtue of Meeron and Fakhouri's violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Prodigy Enterprise)**
**Against Michael Meeron, D.C. and Summer Fakhouri, D.C.**

252.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

253.   Defendants Meeron and Fakhouri conspired with each other and with associates, including the personal injury attorneys and medical practices detailed above, to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Prodigy.

254.    Meeron, Fakhouri, and their associates each agreed to further, facilitate, support, and operate the Prodigy enterprise.

255.    As such, Meeron and Fakhouri conspired to violate 18 U.S.C. §1962(c).

256.    The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Prodigy even though Prodigy was not eligible to collect such payments by virtue of its unlawful conduct.

257.    Meeron and Fakhouri were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

258.    Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of Meeron and Fakhouri's unlawful conduct described herein.

259.    By virtue of this violation of 18 U.S.C. § 1962(d), Meeron and Fakhouri are liable to Liberty Mutual and Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted by or on behalf Meeron, Fakhouri, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## COMMON LAW FRAUD
### Against All Defendants

260.  Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

261.  The scheme to defraud perpetrated by Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri ("Count VII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to payment from Liberty Mutual.

262.  The misrepresentations of fact made by the Count VII defendants include, but are not limited to, those material misrepresentations discussed in section VIII *supra*.

263.  The Count VII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

264.  The misrepresentations were intentionally made by the Count VII defendants in furtherance of their scheme to defraud Liberty Mutual by submitting, causing to be submitted, or knowing that non-compensable claims for payment would be submitted to Liberty Mutual.

265.  The Count VII defendants' misrepresentations were known to be false and were made for the purpose of inducing Liberty Mutual to make payments for claims that are not compensable under the No-Fault Act.

266. Liberty Mutual reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

267. As a direct and proximate result of the defendants' fraudulent representations and acts, Liberty Mutual has been damaged in its business and property as previously described herein.

## COUNT VIII
## CIVIL CONSPIRACY
## Against All Defendants

268. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

269. Defendants Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri ("Count VIII defendants") combined and concerted to accomplish the unlawful purpose of defrauding Liberty Mutual by submitting claims for payment to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

270. The Count VIII defendants worked together to achieve an unlawful purpose (namely, defrauding Liberty Mutual for personal gain).

271.   This purpose was known to all of the Count VIII defendants and intentionally pursued.

272.   Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count VIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Liberty Mutual seeking payment to the defendants.

273.   In reasonable reliance on the false medical documentation submitted by the defendants, Liberty Mutual paid certain of the claims submitted.

274.   All of the Count VIII defendants directly benefited from the payments made to Van Dyke, New Grace, and Prodigy.

275.   All of the Count VIII defendants actively and intentionally partook in a scheme to defraud Liberty Mutual and also encouraged and aided other Count VIII defendants in the commission of acts done for the benefit of all Count VIII defendants and to the unjustified detriment of Liberty Mutual.

276.   Accordingly, all of the Count VIII defendants are equally liable for the fraud perpetrated on Liberty Mutual pursuant to their conspiracy.

**COUNT IX**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Van Dyke Spinal Rehabilitation PLLC, New Grace Spinal**
**Rehabilitation, PLLC, and Prodigy Spinal Rehabilitation, LLC**

277.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

278.    Liberty Mutual paid the amounts described herein and itemized in Exhibits 6 through 8 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Liberty Mutual by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Van Dyke, New Grace, and Prodigy ("Count IX defendants").

279.    Liberty Mutual sustained damages by paying under a mistake of fact the claims submitted by the Count IX defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

280.    The Count IX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Liberty Mutual under a mistake of fact.

281.    Liberty Mutual is entitled to restitution from each of the Count IX defendants, individually and jointly, for all monies paid to and/or received by them from Liberty Mutual.

## COUNT X
## UNJUST ENRICHMENT
### Against All Defendants

282.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

283.   Liberty Mutual paid monies, including those amounts set out in Exhibits 6 through 8, in response to the claims submitted, or caused to be submitted, by defendants Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri ("Count X defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

284.   Liberty Mutual's payments constitute a benefit which the Count X defendants aggressively sought and voluntarily accepted.

285.   The Count X defendants wrongfully obtained payments from Liberty Mutual through the fraudulent scheme detailed herein.

286.   The Count X defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Liberty Mutual.

287.   The Count X defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

288. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 205 set forth above as if fully set forth herein.

289. Defendants Van Dyke, New Grace, Prodigy, Meeron, Pulice, and Fakhouri ("Count XI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

290. The Count XI defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Liberty Mutual, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

291. Pursuant to Michigan law, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully-rendered treatment.

292. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

293. The Count XI defendants continue to submit claims for No-Fault payments for unnecessary and unlawfully rendered medical services to Liberty Mutual, and other claims remain pending with Liberty Mutual.

294.   The Count XI defendants will continue to submit claims for No-Fault payments absent a declaration by this Court that Liberty Mutual has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XI defendants for any or all of the reasons set out in the within Complaint.

295.   Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants billed for unnecessary and unlawful treatment and services that are not compensable under applicable provisions of Michigan law

296.   Liberty Mutual also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and services at all relevant times.

297.   As such, the Count XI defendants have no standing to submit, pursue, or receive any payment from Liberty Mutual, and Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot seek payment from Liberty Mutual under any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

298.   Liberty Mutual further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot

balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XII.   **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and SAFECO Insurance Company of Illinois respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Van Dyke Enterprise)**
**Against Michael Meeron, D.C. and Anthony Pulice, D.C.**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Van Dyke Enterprise)
### Against Michael Meeron, D.C. and Anthony Pulice, D.C.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Grace Enterprise)
### Against Michael Meeron, D.C.

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(New Grace Enterprise)**
**Against Michael Meeron, D.C.**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Prodigy Enterprise)**
**Against Michael Meeron, D.C. and Summer Fakhouri, D.C.**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Prodigy Enterprise)
### Against Michael Meeron, D.C. and Summer Fakhouri, D.C.

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VII
## COMMON LAW FRAUD
### Against All Defendants

(a)    AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT VIII
## CIVIL CONSPIRACY
### Against All Defendants

(a)    AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT IX
**PAYMENT UNDER MISTAKE OF FACT**
**Against Van Dyke Spinal Rehabilitation PLLC, New Grace Spinal Rehabilitation, PLLC, and Prodigy Spinal Rehabilitation**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT X
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just

## COUNT XI
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)    DECLARE that Liberty Mutual has no obligation to pay pending and previously-denied insurance claims submitted by Van Dyke Spinal Rehabilitation PLLC, New Grace Spinal Rehabilitation, PLLC, Prodigy Spinal Rehabilitation, PLLC, Michael Meeron, D.C., Anthony Pulice, D.C., and Summer Fakhouri, D.C., jointly and severally, for any or all of the reasons set out in the within Complaint.

64

(b)     DECLARE that Van Dyke Spinal Rehabilitation PLLC, New Grace Spinal Rehabilitation, PLLC, Prodigy Spinal Rehabilitation, PLLC, Michael Meeron, D.C., Anthony Pulice, D.C., and Summer Fakhouri, D.C., jointly and severally, cannot seek payment from Liberty Mutual pursuant to any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Van Dyke Spinal Rehabilitation PLLC, New Grace Spinal Rehabilitation, PLLC, Prodigy Spinal Rehabilitation, PLLC, Michael Meeron, D.C., Anthony Pulice, D.C., and Summer Fakhouri, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy between Liberty Mutual and its insureds or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XIII.  DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*

Dated: October 9, 2020